## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TOLEDO HOSPITAL,<br><br>            *Plaintiff*,<br><br>    v.<br><br>XAVIER BECERRA,[1]<br>*in his official capacity as Secretary of the*<br>*Department of Health and Human Services*<br><br>            *Defendant.* | No. 19-cv-3820 (DLF) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Toledo Hospital brings this suit against the Secretary of the Department Health and Human Services (the Secretary) challenging the agency's denial of certain capital cost reimbursements under the Medicare Act. The agency relied on a 2006 final rule (the Rule) in denying the requested reimbursements.

Before the Court are cross-motions for summary judgment. Dkt. 16; Dkt. 18. The Court concludes that the Secretary acted arbitrarily and capriciously when it promulgated the Rule without considering the relative costs of capital based on the hospitals' locations. Accordingly, the Court will grant in part Toledo Hospital's motion, deny the Secretary's motion, set aside the Secretary's final determination, and remand this case to the fiscal intermediary to reconsider whether Toledo Hospital is entitled to receive certain capital cost reimbursements under the Medicare Act.

---

[1] When this suit began, Alex Azar was the Secretary of the Department of Health and Human Services. When Xavier Becerra became Secretary, he was automatically substituted as the proper defendant. *See* Fed. R. Civ. P. 25(d).

## I.      BACKGROUND

### A.      Statutory and Regulatory Background

The Medicare Act establishes a federally-funded health insurance program for the elderly and disabled.  *See* 42 U.S.C. § 1395 *et seq.*  Medicare is administered by the Centers for Medicare and Medicaid Services, "a division of the Department of Health and Human Services, under the executive management of the Secretary."  *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1157 (D.C. Cir. 2015).  Under this "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), the government pays participating hospitals for certain costs that they incur in treating Medicare beneficiaries.  *Methodist Hosp. v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994).  Initially, participants were reimbursed for the actual costs that they incurred, so long as the claimed costs were deemed reasonable.  *Anna Jacques Hosp.*, 797 F.3d at 1157.  In 1983, concerned that this system provided hospitals with "little incentive to keep costs down," Congress implemented the Inpatient Prospective Payment System (PPS) to reimburse hospitals at "prospectively fixed rates."  *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999) (quotation omitted); *see* Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149.

### 1.   Medicare Prospective Payments for Operating Costs: Subsection (d)

The Act provides for the reimbursement of hospital *operating* costs in subsection (d) of § 1395ww.  *See* 42 U.S.C. § 1395ww(d).  This reimbursement is based on predetermined rates for patient discharges that are "set according to historic regional costs and patients' diagnoses."  *Bayside Cmty. Hosp. v. Sebelius*, No. 07-cv-1562, 2009 WL 9536725, at *1 (D.D.C. Sept. 30, 2009).

Subsection (d) sets out a complicated and detailed process for calculating payment under the operating PPS.  Prospective "payment rates are tied to the national average cost of treating a patient in a particular 'diagnosis-related group.'"  *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914 (D.C. Cir. 2009) (quoting 42 U.S.C. § 1395ww(d)).  Thus, for a given inpatient discharge, the Secretary calculates an expected cost based on average resources used and costs incurred, 42 U.S.C. § 1395ww(d)(4), and "establishes a nationwide standardized rate for all subsection (d) hospitals located in an 'urban' or 'rural' regional area."  *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 794 F.3d 383, 387 (3d Cir. 2015) (citing 42 U.S.C. § 1395ww(d)(2)(A)–(D)).  The Secretary then adjusts this rate by, among other factors, a "wage index" based on the "specific geographic area where the hospital is located."  *Id.*  This accounts for "the difference between hospitals' local wages and wage-related costs and the national average."  *Id.* (citing § 1395ww(d)(3)(E)); *see* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates, 70 Fed. Reg. 47,278, 47,281 (Aug. 12, 2005).  A higher wage index corresponds with higher labor costs, and consequently, a higher reimbursement rate for the hospital.  *Geisinger*, 794 F.3d at 387.

A hospital's geographic placement plays a key role in determining its operating prospective payment rate.  For instance, a facility's location—urban or rural—will affect the facility's wage index value.  *See* 42 U.S.C. § 1395ww(d)(3)(E)(i).  The Secretary has defined an "urban area" by adopting the definition of "metropolitan statistical area" promulgated by the Office of Management and Budget.  *See* 42 C.F.R. § 412.64(b)(1)(ii)(A); *Baystate Franklin Med. Ctr. v. Azar*, 319 F. Supp. 3d 514, 518 (D.D.C. 2018).  A "rural area" is "any area outside an urban area."  42 C.F.R. § 412.64(b)(1)(ii)(C); *see E. Tex. Med. Ctr.-Athens v. Azar*, 337 F. Supp. 3d 1, 5 (D.D.C. 2018).

Initially, this reimbursement system "yielded inequitable results for some hospitals." *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 276 (3d Cir. 2002).  For example, a hospital in an area with a low wage index might in fact "compete for the same labor pool as hospitals in a nearby, larger urban area." *Id.*  Yet even though its labor costs are high, it would receive a lower reimbursement "based on its geographical area's wage index." *Lawrence + Memorial Hosp. v. Burwell*, 812 F.3d 257, 260 (2d Cir. 2016).

### 2.  Geographic Reclassification Mechanisms

To solve this problem, in 1989, Congress enacted a new provision within subsection (d) to establish a geographic reclassification system.  42 U.S.C. § 1395ww(d)(10); *see Robert Wood Johnson Univ.*, 297 F.3d at 276.  Under this system, the newly-created Medicare Geographic Classification Review Board (Board) "can redesignate hospitals to a different area from that to which they have been otherwise designated, in order to receive a different wage reimbursement rate" if they meet certain criteria.  *Lawrence + Memorial Hosp.*, 812 F.3d at 259 (citing 42 U.S.C. § 1395ww(d)(10)).  Thus, a hospital (either rural or urban) with a lower wage index can reclassify to a higher wage index area (often, a nearby urban area) to more accurately reflect its labor costs.  *See id.* at 260–61.

And when a rural hospital redesignates to an urban area for a different wage reimbursement rate, it otherwise retains its rural status.  *See* Geographical Classification Review Board; Procedures and Criteria, 55 Fed. Reg. 36,754, 36,760 (Sept. 6, 1990) ("A hospital that is reclassified from a rural or other urban area only for purposes of the wage index is not considered urban for any other purpose than its labor market area designation.").  As a result, "a hospital [may] reasonably be viewed as 'rural' in some respects (*e.g.*, it is situated in a rural area and attends to the needs of a rural population) and 'urban' in other respects (*e.g.*, it needs to

attract trained staff from nearby urban areas and to do so must pay urban wage rates)."

*Lawrence + Memorial Hosp.*, 812 F.3d at 259.

In 1999, Congress enacted a new geographic reclassification scheme.  Section 401 of the Medicare, Medicaid, and SCHIP Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501, amends, in relevant part, subsection (d).  Section 401 permits select hospitals located in an urban area to be reclassified as rural.  *See* 42 U.S.C. § 1395ww(d)(8)(E).[2] To reclassify from urban to rural, a hospital can, for instance, demonstrate that it would qualify as a rural referral center[3] or a sole community hospital[4] but for its urban status.  42 U.S.C. § 1395ww(d)(8)(E)(ii)(III).  Unlike the wage-index reclassification, a Section 401 reclassification is not based on the hospital's costs.  *See id.*

---

[2] Section 401 states:

> For purposes of this subsection, not later than 60 days after the receipt of an application (in a form and manner determined by the Secretary) from a subsection (d) hospital described in clause (ii), the Secretary shall treat the hospital as being located in the rural area (as defined in paragraph 2(D)) of the State in which the hospital is located.

42 U.S.C. § 1395ww(d)(8)(E)(i).

[3] To qualify as a rural referral center, a hospital can meet as few as two criteria: (1) it has 275 or more beds, and (2) it is located in a rural area.  *See* 42 U.S.C. § 1395ww(d)(5)(C)(i).  Hospitals with RRC status are exempted from the proximity requirement of the Board process, *see* 42 C.F.R. § 412.230(a)(3)(i), and any hospital that "was ever" an RRC is exempt from the requirement that its wages meet certain benchmarks relative to those of its existing classification area. *See* 42 C.F.R. § 412.230(d)(3)(i).

[4] A "sole community hospital" is defined to include any hospital that "the Secretary determines is located more than 35 road miles from another hospital," that is "the sole source of inpatient hospital services reasonably available to [Medicare beneficiaries] in a geographic area," or "that is located in a rural area and designated by the Secretary as an essential access community hospital."  42 U.S.C. § 1395ww(d)(5)(D)(iii).

Accordingly, under the current reclassification mechanisms, a geographically urban hospital may be "classified as 'rural' in order to obtain favorable drug pricing" that it could not have otherwise received, among other benefits under Section 401. *Lawrence + Memorial Hosp.*, 812 F.3d at 259. And at the same time, the hospital may apply to the Board to be designated to a higher wage-index urban area (including a different urban area than the one in which the hospital is geographically located) in order to obtain higher wage reimbursements. *Id.*

### 3. Medicare Prospective Payments for Capital Costs: Subsection (g)

Under the Act, there is also a prospective payment system for a hospital's *capital* costs: the capital prospective payment system, or capital PPS. 42 U.S.C. § 1395ww(g). As with operating costs, "until the late 1980s, capital reimbursements were provided on a reasonable cost basis," but in 1987, "Congress directed the Secretary . . . to develop a capital recovery scheme for hospitals through the inpatient prospective payment system." *Select Specialty Hosp.- Bloomington, Inc. v. Burwell*, 757 F.3d 308, 309 (D.C. Cir. 2014); *see* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100–203, § 4006(b)(1), 101 Stat. 1330. The Act provides for the capital PPS in subsection (g) of § 1395ww. *See* 42 U.S.C. § 1395ww(g). In contrast to subsection (d)'s provisions governing the operating PPS, under subsection (g), Congress granted the Secretary broad discretion to design and implement the capital PPS. *See id.*

Under subsection (g), the Secretary "*shall* provide for (I) a payment on a per discharge basis, and (II) an appropriate weighting of such payment amount as relates to classification of the discharge." *Id.* § 1395ww(g)(1)(B)(i) (emphasis added). The remaining features of the capital PPS are discretionary. For instance, the Secretary "*may* provide for an adjustment to take into account variations in the relative costs of capital and construction for the different types of

facilities or areas in which they are located."  42 U.S.C. § 1395ww(g)(1)(B)(ii) (emphasis added).  But such an adjustment is not required.

In 1991, the Secretary implemented Congress' revision to the Medicare payment methodology for capital-related costs.  *See* Prospective Payment System for Inpatient Hospital Capital-Related Costs, 56 Fed. Reg. 43,358 (Aug. 30, 1991).  As with the operating PPS, under the capital PPS, Medicare's base rates are tied to diagnosis-related groups.  42 U.S.C. § 1395ww(g)(1)(B)(i).  And the Secretary chose to use the same diagnosis-related group weights as in the operating PPS because the hospital cost data indicated that the operating PPS diagnosis-related group system was highly correlated with capital cost.  56 Fed. Reg. at 43,372–73.

The Secretary then conducted an extensive cost data analysis to determine what kinds of payment adjustments should be made to the capital PPS diagnosis-related group inpatient discharge reimbursement.  The Secretary "did extensive regression analysis of the relationship between capital costs and the payment variables used in the prospective payment system for operating costs in order to determine which adjustments would be appropriate for capital payments."  56 Fed. Reg. at 43,369.  As a product of this study, the Secretary determined that capital costs were correlated with a hospital's (a) wage index, (b) large urban status, (c) disproportionate share of low-income patient status, (d) teaching hospital status, and (e) cost of living in Alaska and Hawaii.  *Id.* at 43,370.

Based on these findings, the Secretary decided to make an adjustment to the capital PPS reimbursement rate based on a hospital's disproportionate share status.  The cost analysis indicated that a hospital's disproportionate share percentage of low-income patients affects capital costs for *urban* hospitals with at least 100 beds.  56 Fed. Reg. at 43,377.  Thus, the Secretary created a capital disproportionate share adjustment ("capital DSH adjustment") for

these hospitals.  42 C.F.R. § 412.320.  But the Secretary did not find the same effect on costs for rural hospitals or urban hospitals with fewer than 100 beds.  56 Fed. Reg. at 43,377.  As a result, those hospitals are not eligible for a capital DSH adjustment.  42 C.F.R. § 412.320(a)(1).

>     *4. The Effect of Section 401 Reclassification on Capital DSH Adjustment Eligibility*

This case concerns how the Section 401 reclassification process affects reimbursement under the capital PPS—in particular, the capital DSH adjustment.  In 2006, the Secretary, through notice-and-comment rulemaking, proposed changes to the regulations that govern capital DSH adjustments.  *See* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates, 71 Fed. Reg. 47,870, 48,104 (Aug. 18, 2006).  Under the new Rule, geographically urban hospitals that reclassify as rural under Section 401 are ineligible for the capital DSH because the Secretary treats them as *rural* for purposes of determining capital DSH eligibility.  And only *urban* hospitals with more than 100 beds are eligible for the capital DSH adjustment.  *See* 42 C.F.R. § 412.320(a)(1)(iii).  The Rule states, in relevant part:

> (a) Criteria for classification.  A hospital is classified as a "disproportionate share hospital" for the purposes of capital prospective payments if either of the following conditions is met:
>
> (1) The hospital is located in an urban area, has 100 or more beds as determined in accordance with § 412.105(b), and serves low-income patients as determined under § 412.106(b).
>
> . . .
>
> (iii) For purposes of this section, the geographic classifications specified under § 412.64 apply, except that, effective for discharges occurring on or after October 1, 2006, for an urban hospital that is reclassified as rural as set forth in § 412.103, the geographic classification is rural.

*Id.*

In promulgating the 2006 Rule, the Secretary stated that the changes were necessary for two reasons: first, in order to "reflect [the agency's] historic policy that hospitals reclassified as rural under [Section 401] are considered rural under the capital PPS," and second, to further the Secretary's historic practice of pursuing consistency in the geographic classifications used for both operating and capital PPS calculations.  *See* 71 Fed. Reg. at 48,104.  According to the Secretary, a 2004 revision of the capital PPS regulations "inadvertently" removed the regulatory cross-reference that had incorporated the Section 401 reclassifications.  *Id.*  As a result, the 2004 rule stated that capital PPS payment adjustments are based on geographic classifications under 42 C.F.R. § 412.64, a section that did not address urban-to-rural reclassifications under Section 401.

But now, following the Secretary's 2006 Rule, a geographically *urban* hospital that reclassifies as *rural* under Section 401 for *operating* PPS purposes loses its eligibility for the *capital* DSH adjustment under 42 C.F.R. § 412.320(a)(1)(iii).

### B.      Factual and Procedural History

Toledo Hospital is an acute care hospital that participates in the Medicare program.  *See* AR at 1, Dkt. 23.  Although it is located in an urban area—the Toledo Ohio MSA—Toledo Hospital applied to the Secretary to reclassify as rural under Section 401.  The hospital's application was approved with an effective date of September 1, 2016.  Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. (Pl.'s Mem.), Ex. 1, Dkt. 16-2.

Thereafter, Toledo Hospital applied to the Board to reclassify its wage index to that of Ann Arbor, Michigan (an urban area) to obtain higher wage reimbursements.  *Id.*  That application was granted on February 16, 2017, and effective on October 1, 2017.  *Id.*  On August 29, 2018, Toledo Hospital's Medicare administrative contractor (its "fiscal intermediary")

informed the hospital that it had issued a final determination denying its request to receive a capital DSH adjustment from the effective date of its rural reclassification, as required by the 2006 Rule.  AR at 30–31.

A provider may appeal its reimbursement payment to the Provider Reimbursement Review Board (PRRB).  42 U.S.C. § 1395oo(a).  When the contested issue before the PRRB "involves a question of law or regulations relevant to the matters in controversy [and] the [PRRB] determines (on its own motion or at the request of the provider of services . . . ) that it is without authority to decide the question," 42 U.S.C. § 1395oo(f)(1), "[t]he Medicare Act provides for expedited judicial review in federal district court," *E. Tex. Med. Ctr.-Athens*, 337 F. Supp. 3d at 7; *see also Allina Health Servs. v. Price*, 863 F.3d 937, 938 (D.C. Cir. 2017) (noting that "the [PRRB] does not have the authority to declare statutes or regulations invalid"). "The [PRRB's] determination regarding its legal authority 'shall be considered a final decision and not subject to review by the Secretary.'" *E. Tex. Med. Ctr.-Athens*, 337 F. Supp. 3d at 7 (quoting 42 U.S.C. § 1395oo(f)(1)).  "[A] district court may not review the Board's no-authority determination" because the Medicare "statute conditions expedited judicial review in the district court on the existence of that no-authority determination, *not* on whether that determination is correct."  *Allina Health Servs.*, 863 F.3d at 941.

On February 22, 2019, Toledo Hospital requested a hearing before the PRRB.  AR at 27. On September 30, 2019, Toledo Hospital asked the PRRB to grant expedited judicial review, and the PRRB did so on October 30, 2019.  AR at 3–10.  This Court has jurisdiction because the PRRB's no-authority determination triggered direct "judicial review of any action of the fiscal intermediary" under § 1395oo(f)(1).  *See, e.g.*, *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24,

27 (D.C. Cir. 2005).  Thus, a review of the Medicare administrative contractor's adjudication is properly before this Court.

On December 24, 2019, Toledo Hospital filed its initial complaint before this Court.  *See generally* Compl., Dkt. 1.  The hospital alleges that the 2006 Rule violates the plain language of the Medicare Act and that Secretary acted arbitrarily and capriciously in promulgating the Rule, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).

## II.    LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Co–op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained."). The court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted). The court "is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotation mark omitted). For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The party challenging an agency's action as arbitrary and capricious bears the burden of proof. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

To the extent that an agency action is based on the agency's interpretation of a statute it administers, the court's review is governed by the two-step *Chevron* doctrine. At Step One, a court must determine "whether Congress has directly spoken to the precise question at issue" or instead has delegated to an agency the legislative authority to "elucidate a specific provision of the statute by regulation." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843–44 (1984). If the latter, a court must reach Step Two, which asks whether the agency

action "is based on a permissible construction of the statute" or instead is "manifestly contrary to the statute." *Id.*

### III.   ANALYSIS

Toledo Hospital raises two claims in this action.  Compl. ¶¶ 112–22.  First, it argues that the 2006 Rule violates the plain language of the Medicare Act.  *Id.* ¶¶ 112, 115.  Second, the hospital contends that the Secretary's interpretation of the Act is unreasonable because the 2006 rulemaking was arbitrary and capricious.  *Id.* ¶ 122.

### A.   *Chevron*

Congress has expressly delegated to the Secretary the authority and discretion to create the capital PPS, *see* 42 U.S.C. § 1395ww(g), and the Secretary promulgated the 2006 Rule through notice-and-comment rule-making.  Thus, the Rule is entitled to *Chevron* deference, and Toledo Hospital does not argue otherwise.  Indeed, courts have repeatedly held that "[t]he broad deference of *Chevron* is even more appropriate in cases that involve a 'complex and highly technical regulatory program,' such as Medicare, which 'require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns.'"  *Robert Wood Johnson Univ.*, 297 F.3d at 282 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also Methodist Hosp.*, 38 F.3d at 1129 ("[I]n framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute.").

#### 1.   *Step One*

The Court begins, as it must, with the text of the Act.  If "Congress has spoken directly to the precise question at issue," the Court "must give effect to [its] unambiguously expressed intent."  *Chevron*, 467 U.S. at 842–43.  "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Regul. Grp. v. EPA*. 573

U.S. 302, 328 (2014).  "In making the threshold determination under *Chevron*, a reviewing court should not confine itself to examining a particular statutory provision in isolation."  *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 223 (D.C. Cir. 2007) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).  Instead, the Court must look to the statute as a whole.  *See Fin. Plan. Ass'n v. SEC*, 482 F.3d 481, 487 (D.C. Cir. 2007) (explaining that a court should analyze "the text, structure, and the overall statutory scheme, as well as the problem Congress sought to solve").

Toledo Hospital argues that the 2006 Rule violates the plain meaning of the Act because (1) Section 401, as implemented under subsection (d), limits the Secretary's consideration of Section 401 reclassifications to the *operating* PPS and (2) the 2006 Rule does not "take into account" the costs of capital by area of location or type of facility, violating subsection (g).  Pl.'s Mem. at 25, 29.  The Court addresses each argument in turn.

First, Section 401's opening clause states that the Secretary shall treat reclassified "hospital[s] as being located in the rural area" "[f]or the purposes of this subsection." 42 U.S.C. § 1395ww(d)(8)(E)(i).  In Toledo Hospital's view, this clause requires the Secretary to treat Section 401 reclassified hospitals as rural for the purpose of the operating PPS, but it prevents him from treating them as rural for the purpose of the capital PPS—and consequently, the capital DSH adjustment.  *See* Pl.'s Mem. at 25.

But Toledo Hospital misreads Section 401.  The opening clause does not say that the Secretary may consider Section 401 reclassifications "for the purposes of this subsection *only*." 42 U.S.C. § 1395ww(d)(8)(E)(i).  Instead, it makes clear that for the entire subsection (d) (i.e., the entire operating PPS), the Secretary shall treat the reclassified hospitals as rural.  The clause does not, however, preclude the Secretary from making eligibility determinations under the

capital PPS of subsection (g).  And Toledo Hospital points to no other statutory provision that prevents the Secretary, in his broad discretion, from treating operating PPS locations as the area of location under the capital PPS.

Toledo Hospital's second argument, focusing on the capital PPS statutory provision, fares no better.  Under subsection (g), the Secretary "may provide for an adjustment to *take into account* variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located."  42 U.S.C. § 1395ww(g)(1)(B)(ii) (emphasis added).  The hospital contends that the Secretary's 2006 Rule violates the plain meaning of this provision because any adjustment the Secretary creates, including a capital DSH adjustment, "must pay more to hospitals that are of a type that typically incur greater capital costs."[5]  Pl.'s Reply at 4, Dkt. 19.  So in the hospital's view, the text dictates that it must be eligible for the capital DSH adjustment.

But the Act does not *require* precise overlap in prospective rates of reimbursement for capital costs and actual costs.  It merely requires the Secretary to "take into account" variations in relative capital costs.  Other courts have found that when Congress directs an agency to "take into account" a factor in its decisionmaking, it directs the agency only to "consider" or "make an allowance for" that factor.  *See, e.g.*, *La. Env't Action Network v. EPA*, 955 F.3d 1088, 1098 (D.C. Cir. 2020) ("The Oxford English Dictionary, for example, defines 'to take into account' as 'to take into consideration as an existing element, to notice.' *Oxford English Dictionary* (2d ed. 1989).  And Merriam-Webster's describes to 'take into account' as 'to make allowance

---

[5] Implicitly, Toledo Hospital argues that it shares the same capital cost profile as other geographically urban hospitals that receive a capital DSH adjustment.  *See* Pl.'s Reply at 6. Though this may be true, Toledo Hospital has not demonstrated this is the case.

for.'  *Take*, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/take.").

Thus, subsection (g) does not require that any adjustment precisely reflect the exact differences in costs between geographic areas or hospital types.  It does not compel the conclusion that Toledo Hospital must be eligible to receive the capital DSH adjustment.  Instead, the Secretary must merely "consider" or "make allowance for" relative variations in costs, as the Court discusses below.  *See La. Env't Action Network*, 955 F.3d at 1097–98.

### 2. *Step Two & APA Arbitrary & Capricious Review*

Because the Act does not clearly prohibit the Secretary from treating Section 401 reclassified hospitals as rural for operating PPS purposes and denying them urban status for purposes of the capital DSH adjustment, the Court next considers whether the agency's decision to do so "is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  If the Secretary's interpretation is reasonable, the Court "must defer" to the Secretary's interpretation. *Methodist Hosp.*, 38 F.3d at 1229.  "Step two of *Chevron* does not require the best interpretation, only a reasonable one."  *Am. Forest Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008).  At this stage, under *Chevron*, a court must defer to an agency regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 844. Similarly, under the APA, a court must uphold a regulation unless the agency action was "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).[6]

Toledo Hospital contends that the Secretary's 2006 rulemaking is arbitrary and capricious and thus unreasonable for two principal reasons.  First, it charges the Secretary with

---

[6] Thus, *Chevron* step two and arbitrary and capricious review under the APA overlap because "under *Chevron* step two, we ask whether an agency interpretation is arbitrary or capricious in substance."  *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011).

misrepresenting the regulatory history in claiming that the 2006 Rule merely restored a previously implemented policy.  Second, the hospital argues that the Secretary failed to "take into account" relative costs of capital for various hospital types and areas of location, as subsection (g) requires.

Although "[t]he scope of review under the 'arbitrary and capricious' standard is narrow," *State Farm*, 463 U.S. at 43, "[r]easoned decision-making requires that an agency 'articulate a satisfactory explanation for its action' with a 'rational connection between the facts found and the choice made.'" *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *4 (D.D.C. March 12, 2021) (quoting *State Farm*, 463 U.S. at 43)).  An agency's decision must be "supported by the record," *Clark Cnty., Nev. v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008) (quotation marks omitted), and "an agency's action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider" or has "entirely failed to consider an important aspect of the problem." *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (quotation marks omitted); *see Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (explaining that an agency acts arbitrarily if it ignores an issue that Congress directs it to address).  A court cannot uphold agency action based on reasons or rationalizations "other than that expressed by the agency." *Catholic Healthcare W. v. Sebelius*, 748 F.3d 351, 354 (D.C. Cir. 2014).

The Secretary defends the Rule on the ground that an "inadvertent[]" error in the 2004 rulemaking resulted in the removal of a cross-reference in the capital DSH regulation that had previously precluded Section 401 reclassified hospitals from qualifying for the capital DSH adjustment.  71 Fed. Reg. 47,870, 48,104 (Aug. 18, 2006).  According to the Secretary, "technical changes" were necessary "to reflect [the Secretary's] historic policy that hospitals

17

reclassified as rural under [Section 401] are also considered rural under the capital PPS." *Id*.  As he explained, "[s]ince the genesis of the capital PPS," "the same geographic classifications used under the operating PPS also have been used under the capital PPS." *Id*.

The Secretary's reasoning founders at the outset.  To begin, the Secretary conceded in this litigation that he "did not address explicitly through rulemaking whether Section 401 hospitals were eligible for Capital DSH until 2006."  Def.'s Reply at 14, Dkt. 22.  And the Secretary described the 2006 rulemaking as a "choice" made "in 2006" to "disallow[] Capital DSH payments for hospitals in urban areas that were reclassified as rural."  *Id.* at 16.  Elsewhere, the Secretary admitted that he "did not issue a regulation governing Section 401 hospitals and Capital DSH payments" until 2006, long after Section 401 was enacted.  *Id.* at 17.

Ultimately, the Secretary asks the Court to go on (as Toledo Hospital puts it) an "archaeological dig" through a series of confusing regulatory cross-references to prove his historical policy argument.  *See* Hr'g Tr. at 36, Dkt. 27.  The Court remains unconvinced.  The regulatory history is unclear, and past practice cuts against the Secretary's contentions.

The Secretary begins by pointing to the first iteration of the capital DSH regulation, promulgated in 1991 before Section 401 was enacted.  42 C.F.R. § 412.320 (1991).  That rule specified that "[a] hospital is classified as a 'disproportionate share hospital' for the purposes of capital prospective payments if the hospital is located, for purposes of receiving payment under [42 C.F.R.] § 412.63(a), in an urban area . . . ."  56 Fed. Reg. 43,358, 43,452 (Aug. 30, 1991) (original text of 42 C.F.R. § 412.320(a)).  The cross-referenced regulation, § 412.63(a), in turn, concerned the determination of *operating* prospective payment rates for "hospitals located in urban and rural areas . . . as described under paragraphs (b) through (u) of this section."  42 C.F.R. § 412.63(a) (1991).  According to the Secretary, the "[§ 412.63(a)] cross-reference

establishe[d] a policy" that a "hospital's *Capital* DSH adjustment depends on a provision in the *Operating* PPS rate-setting regulation." Def.'s Suppl. Mem. at 10, Dkt. 29.

The Secretary contends that this policy of tying capital DSH adjustments to the operating PPS rate-setting regulation continued through 1999, when Congress passed Section 401. Although the agency did not change the text of § 412.320 (the capital DSH adjustment), it did amend the § 412.63 cross-reference to include the new Section 401 urban-to-rural reclassification provision.[7] In the Secretary's view, the amended cross-reference "established a *policy* . . . that hospitals reclassified from urban to rural under Section 401 would not receive the capital DSH adjustment." Def.'s Suppl. Mem. at 19 (emphasis added). Even if this were the case, that "policy" soon changed: the 2004 rulemaking removed the § 412.63(a) cross-reference entirely, thereby eliminating any link between the capital DSH adjustments and section 401 reclassification. *See* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48,916, 49,187 (Aug. 11, 2004). The capital DSH regulation instead referenced a new provision, § 412.64, which did not mention Section 401 urban-to-rural reclassifications at all; rather, it defined "urban area" by reference to the OMB's "Metropolitan Statistical Area[s]." 42 C.F.R. § 412.64(b)(1)(ii)(A).

The Secretary insists that this 2004 change was inadvertent and not intended to alter the agency's policy of not allowing hospitals like Toledo Hospital (that had reclassified from urban to rural under Section 401) to obtain capital DSH adjustments. Def.'s Suppl. Mem. at 7. Regardless whether the 2004 amendment was a mistake on the agency's part, as the Secretary

---

[7] When Section 401 was promulgated, the revised § 412.63(b)(1) was amended to state: "For purposes of this section, a hospital reclassified as rural may mean . . . a reclassification that results from an urban hospital applying for reclassification as rural as set forth in [Section 401]." *See* Provisions of the Balanced Budget Refinement Act of 1999, 65 Fed. Reg. 47,026, 47,047 (Aug. 1, 2000).

contends, the Court is not convinced that the opaque cross-references demonstrate that the agency *ever* had a clear policy of tying capital DSH adjustment eligibility to the Section 401 reclassification.

To start, *none* of the regulations (cross-references included) explicitly stated that the Section 401 reclassification scheme was tied to capital DHS adjustments, or that classifications under the two schemes were uniform.  And an earlier reclassification mechanism in subsection (d), the standardized rate reclassification, 42 C.F.R. § 412.230(d)(1) (1991),[8] shows that Secretary's cross-reference argument proves too much.  Under the standardized rate reclassification, rural hospitals that reclassified as urban in subsection (d) were eligible to seek capital cost benefits under subsection (g), *including the capital DSH adjustment*.  *See* 56 Fed. Reg. 43,358, 43,379 (Aug. 30, 1991).  In fact, these reclassified hospitals were able to take advantage of the capital DSH adjustment even though the § 412.63 capital DSH cross-reference (on which the Secretary relies here) *did not* refer to § 412.230, the regulatory provision implementing the standardized amount reclassification.  This is a glaring omission.  Had the agency intended to incorporate *all* subsection (d) reclassifications into the capital DSH, it would have included the standardized amount reclassification (§ 412.230) as a cross-reference in § 412.63.  *See* Pl.'s Suppl. Mem. at 14, Dkt. 30.  The operation of the standardized rate

---

[8] When the operating PPS was created, a hospital's prospective payment rate was based on an "average standardized amount" that differed for urban and rural hospitals.  42 U.S.C. § 1395ww(d)(3)(A)(ii).  A rural hospital could apply to the Board to reclassify to the urban standardized rate if it established that it had high total costs resembling the cost structure of neighboring urban hospitals.  42 C.F.R. § 412.230(d)(1) (1991); *see* 55 Fed. Reg. 36,754, 36,761 (Sept. 6, 1990). In 2003, Congress equalized the standardized rates, thus negating the need for standardized-rate reclassification.  Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, § 401, 117 Stat. 2066.

reclassification mechanism calls into question the Secretary's contention that the capital DSH regulation incorporates the Section 401 reclassification in subsection (d).

Nor does the regulatory record show that the agency consistently treated hospitals the same for classification purposes under the operating and capital PPS.  Indeed, it is unclear that the Secretary's purported policy of classification overlap is supported by his treatment of other geographic classifications in § 412.63 (the cross-referenced regulation).  For instance, in 1991, § 412.63(b)(3) stated that a hospital "located in a rural county adjacent to one or more urban areas *is deemed to be located in an urban area*" if the hospital's staff satisfy certain commuter patterns to neighboring urban areas.  42 C.F.R. § 412.63(b)(3) (emphasis added); *see* 42 U.S.C. § 1395ww(d)(8)(B).  Even though such hospitals were treated as urban, the record suggests that they were ineligible for the capital DSH adjustment until 2004. S*ee* Transmittal 1067 to the Medicare Claims Processing Manual, CMS Pub. No. 100-04 (Sept. 25, 2006), at 7; Pl.'s Suppl. Mem. Ex. 5, Dkt. 30-5.  Had a historical policy of treating hospitals the same for classification purposes under the operating and capital PPS existed, these hospitals should have received the capital DSH adjustment before 2004.

The regulatory history instead reveals that the agency was concerned more with cost correlation between the operating and capital PPS, rather than classification consistency.  That is, even if the Secretary aspired to achieve classification consistency, the record shows that he deviated where a calculation of costs dictated that he do so.  For instance, in 1991, *rural* referral centers were eligible for the *urban* standardized rate under the operating PPS, 56 Fed. Reg. at 43,410, but the Secretary declined to extend the same capital adjustments to those hospitals because the capital cost data did not support a connection between rural referral center status and capital costs, *see* 56 Fed. Reg. at 43,378.  And even when the Secretary used operating PPS

classifications for capital PPS reimbursement purposes, he based those decisions on a

determination that the relevant operating PPS classification correlated with capital costs.   In

1991, for example, the Secretary rejected a proposal to create a separate "construction cost

index" because he determined that the operating PPS wage index *was* highly correlated with

capital costs.   56 Fed. Reg. at 43,376.   In other words, the Secretary took into account the costs

of capital and decided, in his discretion, that the operating PPS wage index was sufficiently

predictive.

      The Secretary's muddled cross-reference argument is further undermined because the

agency's actual practice is far from clear.   The Secretary points to three examples from the

relevant period that he claims show that the agency consistently denied capital DSH adjustments

to Section 401 reclassified hospitals.   *See* Def.'s Suppl. Mem. at 24–25.   He notes that all three

of these hospitals were geographically urban hospitals that, absent their Section 401 reclassified

rural status, would have been eligible for the capital DSH adjustment, yet none received the

capital DSH adjustment.   *Id.*   As Toledo Hospital points out, however, none of these three

hospitals ever *requested* the capital DSH adjustment.   Pl.'s Suppl. Mem. at 6.   And at least one

Section 401 reclassified rural hospital that requested the capital DSH adjustment received an

adjustment in fiscal year 2003.   *See* Pl.'s Suppl. Mem. at 6–7.

      Indeed, the 2004 and 2006 rulemakings frustrate the Secretary's claims about the

consistency of the agency's historical practice.   The 2004 Federal Register preamble, which is

the only public document that ever addressed reclassifications under Section 401 before the 2006

capital DSH adjustment rulemaking, suggests that the 2004 change was not inadvertent.   The

Secretary explained that "reclassifications under [subsection (d)] of the Act are *only intended to

be made for purposes of either the standardized amount or the wage index adjustment.*"   *See* 69

Fed. Reg. 48,916, 49,187 (Aug. 11, 2004) (emphasis added).  Because the standardized amount

had been equalized, rural hospitals could no longer reclassify as urban pursuant to that

reclassification mechanism, and thus could not receive a capital DSH adjustment.  *Id.*  As a

result, moving forward, "only hospitals serving low-income patients that are *geographically*

*located* in an urban area . . .  with 100 or more beds . . . will be eligible for DSH payments under

the PPS for capital-related costs under § 412.320."  *Id.* (emphasis added).  And in 2006, the

Secretary explicitly stated, when evaluating data pertaining to the impact of the 2006 Rule, that

twelve hospitals "will be affected by the technical revisions to . . . § 412.320 concerning the

treatment of hospitals reclassified as rural under [Section 401]."  *See* 71 Fed. Reg. at 48,348.  If

the 2006 Rule were a mere technical correction to clarify the agency's historical policy,

presumably zero hospitals should have been affected.

The Court therefore concludes that if the Secretary had any policy concerning Section

401 reclassifications before 2006, he never announced such a policy, much less explained the

basis for it.  This "error[] do[es] not inspire confidence in the fastidiousness of the agency's

decision-making process."  *Xiaomi Corp.*, 2021 WL 950144, at *5.  With that in mind, the Court

turns to whether the agency considered, for purposes of the capital DSH adjustment, the relative

costs of capital for hospitals, like Toledo Hospital, that had reclassified as rural under Section

401 but are physically located in an urban area.

The Secretary has not put forth evidence that the agency took these costs into account,

either in 1991, 2000, 2004, or 2006.[9]  And because the record does not show that the Secretary

---

[9] For the first time in this litigation, the agency suggests that Section 401 hospitals that "qualif[y]
to be treated as rural for purposes of Operating PPS . . . may have a different [capital] cost
structure than the 'typical' urban hospital."  Def.'s Reply at 7.  This argument is unavailing.  For
one, the hypothetical cost distinction presented by the Secretary has no evidentiary support.

articulated a consistent policy of treating these reclassified hospitals as rural for capital DSH adjustment purposes, he cannot fall back on any purported general policy of using operating PPS geographic classifications for capital PPS reimbursements. The Secretary also has not explained, even as a *general matter*, why classification uniformity outweighs the value of more accurate cost reimbursements. *Cf. Anna Jacques Hosp.*, 797 F.3d at 1161 (upholding Secretary's regulation where the Secretary explained why "added precision" "would not justify the added complication") (quotation omitted)). The agency cannot "entirely fail[] to consider" the "relevant data" and the factors that Congress directed it to review. *State Farm*, 463 U.S. at 43. Here, the Secretary did not perform a cost analysis to determine whether reclassified rural hospitals should receive a capital DSH adjustment, nor did he take costs into account at all. For these reasons, the Court concludes that the Secretary's decision was arbitrary.

To be clear, this is not to say that the Secretary cannot treat Section 401 reclassified rural hospitals as rural for purposes of the capital DSH adjustment. Subsection (g) permits the Secretary to vary adjustments by both facility type and area of location, and the Act gives the Secretary discretion to define geographic areas. The fact that subsection (g) only requires the Secretary to "take into account" variations in capital cost for facility types and area of location when providing for adjustments to the capital PPS system means that "the Secretary can make 'reasonable approximations' based on the 'most reliable data available' at the time of

---

Indeed, the Secretary admits that it did not perform a cost analysis for Section 401 hospitals. At oral argument, the Secretary emphasized that "the record doesn't support that the Secretary made any finding with respect . . . to the cost structure . . . of urban hospitals that have reclassified under Section 401." Hr'g Tr. at 23. And at any rate, the Court cannot affirm agency decisions based on an agency's post hoc rationalizations. *Catholic Healthcare W.*, 748 F.3d at 354; *Summer Hill Nursing Home LLC v. Johnson*, 603 F. Supp. 2d 35, 39 (D.D.C. 2009) (rejecting the Secretary's litigation position because "[n]owhere in the Secretary's decision is that rationale articulated, and the Court cannot accept the lawyer's post hoc rationalization").

publication." *Anna Jacques Hosp.* 797 F.3d at 1165 (quoting *Methodist Hosp.*, 38 F.3d at 1230).

But even though the Secretary need not pursue precision with "scientific exactitude," *id.*

(quotation omitted), he must take relative costs "into account" to some degree in determining

adjustments to the capital PPS system. *Cf. Atrium Med. Ctr. v. U.S. Dep't of Health & Hum.*

*Servs.*, 766 F.3d 560, 569 (6th Cir. 2014) ("[T]he Secretary need only 'estimate[]' the proportion

of labor costs and the resulting wage index need only 'reflect' the relative area wage levels.").

Because the record does not demonstrate that the Secretary took relative costs into account when

considering the Rule, the 2006 rulemaking was arbitrary and capricious. Thus, the Rule is

unreasonable and cannot be relied upon to deny Toledo Hospital the capital DSH adjustment.

### B.      Remedy

Toledo Hospital urges this Court to vacate the Rule because there is "no ostensible proper

purpose" for what the agency did "in 2006 that should give [the agency] a second chance."  Hr'g

Tr. at 15; *see* Pl.'s Reply at 19–23.  But vacatur of a rule is not an appropriate remedy on review

of an adjudication; rather, a court must "hold unlawful and set aside [the] agency action," 5

U.S.C. § 706(2), that is unlawful—here, the Medicare administrative contractor's final

determination—and remand for redetermination.  *See, e.g.*, *Affinity Healthcare Servs., Inc. v.*

*Sebelius*, 746 F. Supp. 2d 106, 121 (D.D.C. 2010).  This is particularly true when, as here, a

plaintiff cannot directly challenge the rule under the APA because the six-year statute of

limitations has lapsed.  *See* 28 U.S.C. § 2401(a); *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C.

Cir. 2014) (discussing statute of limitations applicable to APA cases and explaining that it is

jurisdictional).  The Court therefore will remand the case to the fiscal intermediary for a

redetermination as to Toledo Hospital's eligibility for the capital DSH adjustment.

**CONCLUSION**

For the foregoing reasons, the Court grants in part Toledo Hospital's motion and denies the Secretary's motion.  Accordingly, the Court sets aside the Medicare administrative contractor's final determination and remands this case to the fiscal intermediary for further proceedings consistent with this opinion.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 30, 2021